[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-11837

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 21, 2011
JOHN LEY
CLERK

D.C. Docket No. 0:08-cv-60125-MGC

CRYSTAL ENTERTAINMENT & FILMWORKS, INC.,
a Florida corporation,
CRYSTAL ENTERTAINMENT & FILMWORKS II, INC.,
a Florida Corporation

Plaintiffs - Counter
Defendants-Appellants,

versus

JEANETTE JURADO,
ANN CURLESS WEISS,
GIOIA BRUNO,
WALKING DISTANCE ENTERTAINMENT, LLC,
a Nevada Corporation,

Defendants -Counter
Claimants-Appellees,

KELLY MONEYMAKER,

Defendant-Appellee,

PARADISE ARTISTS, INC.,

Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 21, 2011)

Before PRYOR and COX, Circuit Judges, and PANNELL,[*] District Judge.

PRYOR, Circuit Judge:

This appeal is from a judgment against an entertainment company that sued

the current members of "Exposé," an American girl dance band, about the

trademark name of the band. Crystal Entertainment & Filmworks, Inc., is the

purported assignee of the trademark rights of Pantera Group Enterprises and

Pantera Productions, Inc., which created the original Exposé band in 1984. The

current members of Exposé, Jeanette Jurado, Ann Curless, and Gioia Bruno,

replaced the original members of the band in 1986, and the current members,

along with Kelly Moneymaker, have produced several albums and intermittently

performed as Exposé since then. In 2006, in a written agreement with Crystal, the

current members obtained a license to use the Exposé mark when the band

resumed performing. Before the agreement expired, the members of the band

_____

[*]Honorable Charles A. Pannell, Jr., United States District Judge for the Northern District
of Georgia, sitting by designation.

ceased paying licensing fees to Crystal and informed Crystal that they planned to seek federal registration of the Exposé mark through their own company, Walking Distance Entertainment, LLC. Crystal filed a complaint for breach of contract and violations of federal and state statutes and sought damages and injunctive relief. The district court conducted a bench trial and determined that Jurado, Curless, Bruno, and Walking Distance were the common-law owners of the Exposé mark. Because the record supports the findings by the district court, we affirm.

## I. BACKGROUND

Crystal Entertainment & Filmworks, Inc., and Crystal Entertainment & Filmworks II, Inc., are music and film entertainment businesses based in Miami, Florida. Ismael Garcia and Joe Maenza are the only shareholders of Crystal I and II, and Garcia serves as an officer of both corporations. Garcia and Maenza incorporated Crystal I in 1994 to manage performers and artists, and they incorporated Crystal II in 2003 to manage income from record companies. Garcia and Maenza administratively dissolved Crystal I in 2002 and reinstated it in December 2007.

Garcia has also served as an officer of two other companies, Pantera Group Enterprises and Pantera Productions, Inc., and Crystal asserts that these companies were its predecessors-in-interest. Garcia and Francisco Diaz were the only

3

shareholders of Pantera. They administratively dissolved Pantera Productions in 1991 and Pantera Group in 1994.

In 1984, Pantera formed the American girl dance band "Exposé." Garcia, Diaz, and Roy Lott from Arista Records created the name. Garcia testified that, as an officer of Pantera, he had "financed the production, the equipment, the offices, everything, the whole show." Pantera hired Lewis Martineé to write and to produce the songs and lyrics for Exposé, and Martineé received royalties for his efforts.

Exposé originally consisted of three female singers who released a recording of a song entitled "Point of No Return" that was played on radio stations and in dance clubs in Miami, New York, and Los Angeles. Exposé also made several live performances, and at least one member of the band purportedly collected royalties, but the likenesses of the members of the band did not appear on any Exposé albums or commercially available recordings. Garcia testified that the original members of Exposé did not enjoy commercial success: "They started with us when ["Point of No Return"] was not popular, so most of the shows that they did were for free. They did a lot of freebies. It didn't make much money."

In 1986, Jeanette Jurado, Ann Curless (now Ann Curless Weiss), and Gioia Bruno replaced the original members of Exposé and released with Arista Records

a debut album entitled Exposure that reached "triple platinum status," which means that the band sold at least three million copies of the album. The album cover featured photographs of Jurado, Curless, and Bruno. Jurado, Curless, and Bruno did not compose songs or write lyrics for the band, but Bruno testified that they "became the name and the face and the voices of Exposé." Garcia conceded that the new members of the band have been the "face of Exposé since 1986." Garcia also testified that the new members "were critical to the look of the image that we wanted, the concept that we wanted to go out with on the road."

Garcia testified that Pantera hired an attorney to register the Exposé mark with the United States Patent and Trademark Office, but Pantera was denied because, as the attorney informed Pantera, Exposé "was too common a word to protect." Later, on June 15, 1988, Garcia's recording studio, Charisma Recording, Inc., filed an application with the United States Patent and Trademark Office to register the Exposé mark on the principal register as a trademark for "clothing, namely, t-shirts" and as a service mark for "entertainment services, namely, live performances by a vocal and instrumental group." Charisma abandoned the application on November 27, 1989.

Jurado, Curless, and Bruno continued to experience success as the band Exposé. In 1989, Exposé released a second album entitled What You Don't Know

5

that "went gold," which means that the band sold at least 500,000 copies of the album. The album cover featured Jurado, Curless, and Bruno. In 1992, Kelly Moneymaker temporarily replaced Bruno, and Exposé released a third album entitled Exposé with Moneymaker as a member of the group. This album depicted Jurado, Curless, and Moneymaker as the members of the band. The members of Exposé disbanded in 1995, but sales of their music continued; from 1995 until 2005, Arista Records released five compilation albums of pre-recorded music by Exposé.

Crystal contends that, when it was incorporated, after the Pantera companies were dissolved, Pantera assigned its purported rights to the Exposé mark to Crystal. The exact date of this purported assignment is unclear, as neither Garcia nor his attorney could locate the assignment agreement because, as Garcia explained, it was "a 15[-]year[-]old agreement" and his attorney had "moved three times." Garcia also testified that, as a result of the assignment, Arista Records paid royalties to Crystal after the Pantera companies were administratively dissolved. The only evidence in the record of this assignment is Garcia's testimony and a Nunc Pro Tunc Trademark Assignment prepared by Garcia's counsel and signed by Garcia after Crystal filed its initial complaint in this dispute. The 2007 Trademark Assignment purports to assign rights to the Exposé

mark from Pantera to Crystal, and it makes no mention of any prior assignment. Based on this purported assignment, Crystal I claims ownership of the Exposé mark, which is its only asset, and Crystal II claims rights to royalties from the use of the Exposé mark, which is its only source of income.

Jurado, Curless, Bruno, and Moneymaker signed several agreements with Pantera and Crystal about their use of the Exposé mark. In May 1995, for example, Jurado, Curless, and Moneymaker purportedly agreed to execute a release and settlement agreement that absolved them of various obligations that they had owed to Pantera. Only Jurado's signature appears on the agreement, which also provided that Pantera and Charisma had conceived of and owned the Exposé mark, and that Jurado, Curless, and Moneymaker would no longer have the right to use the mark. From May 1995 until August 2003, Crystal was not involved with a band that performed live as Exposé. Garcia testified that he had been unable to assemble another band to perform under that name.

In August 2003, Jurado and Curless executed a trademark and licensing agreement with Crystal I because they wanted to resume performing as Exposé. In the 2003 Agreement, the two singers acknowledged that Crystal I owned the Exposé mark exclusively and controlled its use. The two singers cancelled a tour of performances after one show because Curless had become pregnant.

Jurado, Curless, and Bruno executed a second trademark and licensing agreement with Crystal I in 2006 in anticipation of another tour. In the 2006 Agreement, the three singers acknowledged that Crystal I owned and controlled the Exposé mark. The 2006 Agreement gave Jurado, Curless, and Bruno the discretion to decide when Moneymaker would serve as a replacement. Jurado, Curless, and Bruno selected Paradise Artists, Inc., as their booking agent to schedule their tour dates, and Crystal approved this selection. Without the consent of Crystal, Jurado, Curless, and Bruno advertised the tour on the Internet at two web addresses: "exposeonline.net" and "myspace.com/exposeonline."

In 2007, the relationship between the band members and Crystal reached a "Point of No Return." See Exposé, Point of No Return, on Exposure (Arista Records 1987). Jurado, Curless, and Bruno tired of paying licensing fees to Crystal because Crystal had not promoted or scheduled any performances of Exposé under the 2006 Agreement. Bruno and Jurado testified that they, along with Curless, had directed and controlled everything since the band began performing again in 2006 with no assistance from Crystal. On August 10, 2007, Jurado, Curless, and Bruno sought to register Exposé as a service mark on the principal register for use in connection with "[l]ive musical performances" through their own company, Walking Distance Entertainment, LLC. On August 14, 2007,

8

Jurado's counsel informed Crystal by letter that Crystal likely did not own rights to the Exposé mark for live performances and challenged Crystal to "Tell Me Why" or, more specifically, to prove with clear and convincing evidence that Crystal owned the mark. See Exposé, Tell Me Why, on What You Don't Know (Arista Records 1989). Jurado's counsel stated that, in the absence of that evidence, Walking Distance would continue to pursue its federal registration. Also in August 2007, Jurado, Curless, and Bruno ceased paying Crystal licensing fees under the 2006 Agreement, which expired on December 31, 2007, and instead deposited them with an escrow agent. They continued to perform on tour as Exposé during 2007, 2008, and 2009.

Crystal filed a complaint against the members of the band and Walking Distance in 2007, but the district court dismissed that complaint without prejudice for lack of subject matter jurisdiction. In 2008, Crystal filed a new complaint that alleged that Jurado, Curless, Bruno, Moneymaker, Paradise, and Walking Distance had breached the 2006 Agreement and had violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Anticybersquatting Consumer Protection Act, id. § 1125(d); and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq. Crystal sought a preliminary and permanent injunction, damages, and a constructive trust for the licensing fees that Jurado's counsel had placed in

9

escrow. The district court dismissed Moneymaker from the lawsuit for lack of service and dismissed Paradise.

Jurado, Curless, Bruno, and Walking Distance filed an answer and asserted counterclaims against Crystal for rescission of the 1995, 2003, and 2006 Agreements. Crystal moved for a summary judgment against the counterclaims. The district court granted summary judgment in favor of Crystal on the counterclaim that sought rescission of the 1995 Agreement, but allowed the counterclaims for rescission of the 2003 and 2006 Agreements to remain pending.

After a three-day bench trial, the district court made several findings of fact in favor of Jurado, Curless, and Bruno: all of the Exposé albums contained photographs of Jurado, Curless, and Bruno as the band Exposé, except for the album where Moneymaker temporarily replaced Bruno; Jurado, Curless, and Bruno created the goodwill associated with the Exposé mark; like the band members in Bell v. Streetwise Records, Ltd., 640 F. Supp. 575 (D. Mass. 1986), Jurado, Curless, and Bruno "are the product that is denoted by the mark Exposé"; a member of the public who purchased a ticket to an Exposé concert would expect to see Jurado, Curless, and Bruno; and Moneymaker's involvement was at the discretion of Jurado, Curless, and Bruno. The district court also made several findings of fact against Crystal: Crystal failed to prove that it had selected

10

Moneymaker, that it had exercised control over Jurado, Curless, and Bruno, or that it had taken an active role in scheduling their performances; Crystal failed to prove that use of the Exposé mark by Jurado, Curless, and Bruno would cause public confusion; Crystal failed to prove that Jurado, Curless, and Bruno had registered domain names that included the term "Exposé" with a bad faith intent to profit; the agreements relied upon by Crystal were not sufficiently public to identify Crystal as the source of the Exposé albums and performances; the involvement of Crystal with the Exposé band was limited to collecting royalties from the sale of records; Garcia conceded that he had been unable to put a different group together to perform as Exposé since 1986; and Garcia's testimony contained inconsistencies that rendered him less credible than the other witnesses.

The district court found that Crystal had failed to prove that it owned the Exposé mark or that the use of the mark by Jurado, Curless, Bruno, and Walking Distance was likely to cause consumer confusion. The district court ruled that Jurado, Curless, and Bruno were the "common law owners of the mark" because they had used the mark publicly since 1986. The district court reasoned that "the public's interest [was] best served by exclusively awarding [rights to the mark] to [Jurado, Curless, Bruno, and Walking Distance]," and "[t]o do otherwise would leave the name available to anyone who wanted to perform under the name

11

Exposé, and cause unnecessary consumer confusion." The district court granted judgment in favor of Jurado, Curless, Bruno, and Walking Distance and against Crystal on its claims under the Lanham Act, the Anticybersquatting Consumer Protection Act, and the Florida Deceptive and Unfair Trade Practices Act. The district court also denied Crystal a constructive trust.

The final judgment was not the "End of the World" for Crystal, see Exposé, End of the World, on Exposé Greatest Hits (Arista Records 1995), because the district court ruled in favor of Crystal on its claim for breach of the 2006 Agreement. The district court held that the 2006 Agreement was valid and "clearly establishe[d] that [Jurado, Curless, and Bruno] agree[d] to pay [Crystal] ten percent of the gross from any live appearances and merchandising." The district court also entered judgment against the counterclaims of Jurado, Curless, Bruno, and Walking Distance because they had "failed to prove by a preponderance of the evidence sufficient grounds for rescission."

The district court allowed the federal registration proceedings of Walking Distance for the Exposé mark to proceed. The United States Patent and Trademark Office published notice of the Exposé mark for opposition on June 10, 2008, and Walking Distance currently owns the live service mark. Crystal timely appealed the final judgment of the district court. Jurado, Curless, Bruno, and

Walking Distance filed a belated Notice of Cross-Appeal, which we dismissed as untimely.

## II.  STANDARDS OF REVIEW

"After a bench trial, we review the district court's conclusions of law <u>de novo</u> and the district court's factual findings for clear error." <u>Proudfoot Consulting Co. v. Gordon</u>, 576 F.3d 1223, 1230 (11th Cir. 2009).  Under the clear error standard, "we may reverse the district court's findings of fact if, after viewing all the evidence, we are 'left with the definite and firm conviction that a mistake has been committed.'" <u>HGI Assocs., Inc. v. Wetmore Printing Co.</u>, 427 F.3d 867, 873 (11th Cir. 2005) (quoting <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).  "The credibility of a witness is in the province of the factfinder and this court will not ordinarily review the factfinder's determination of credibility." <u>United States v. Copeland</u>, 20 F.3d 412, 413 (11th Cir. 1994).

## III.  DISCUSSION

We divide our discussion in two parts.  First, we explain that the district court did not err when it found that Crystal had failed to prove that it has enforceable rights in the Exposé mark at common law.  Second, we explain that the remaining arguments of Crystal are without merit.

*A. The District Court Did Not Err When It Determined That Jurado, Curless, and Bruno Were the Common-Law Owners of the Exposé Mark.*

"Seasons Change," see Exposé, Seasons Change, on Exposure (Arista Records 1987), but the law of this Circuit about the requirements for ownership of a trademark or service mark at common law has remained relatively constant. Even if a mark is not federally registered, "the use of another's unregistered, i.e., common law, trademark 'can constitute a violation of [section 43(a) of the Lanham Act].'" Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984) (quoting Bos. Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg., Inc., 510 F.2d 1004, 1010 (5th Cir. 1975)).

Section 43(a) of the Lanham Act provides a federal cause of action for infringement of an unregistered trademark or service mark:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

14

15 U.S.C. § 1125(a)(1).  To establish a prima facie case under section 43(a), "a plaintiff must show (1) that the plaintiff had enforceable . . . rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'"  Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (quoting Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc., 106 F.3d 355, 358 (11th Cir. 1997)).  We address each of these requirements in turn.

### 1.  The Record Supports the Finding That Crystal Has No Enforceable Rights in the Exposé Mark.

The parties recognize the bedrock principle of trademark law that a mark can identify and distinguish only a single commercial source, see 2 J. McCarthy, Trademarks and Unfair Competition § 16:40, p. 16-77 (4th ed. 2011), and the opposing parties request this Court to "Let Me Be the One" who obtains rights to the Exposé mark, see Exposé, Let Me Be the One, on Exposure (Arista Records 1987).  Crystal argues that it is the rightful owner because Pantera first appropriated the mark in 1984, but the record supports the finding to the contrary by the district court.

Common-law trademark rights are "'appropriated only through actual prior use in commerce.'"  Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193–94 (11th Cir. 2001) (quoting Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889

15

F.2d 1018, 1022 (11th Cir. 1989)). "[T]he use of a mark in commerce . . . must be sufficient to establish <u>ownership rights</u> for a plaintiff to recover against subsequent users under section 43(a)." <u>Id.</u> at 1195. Crystal bore the burden of proving its prior use.

We have applied a two-part test to determine whether a party has proved "prior use" of a mark sufficient to establish ownership: "'[E]vidence showing, first, adoption, and, second, use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'" <u>Id.</u> (alteration in original) (footnotes omitted) (quoting <u>New Eng. Duplicating Co. v. Mendes</u>, 190 F.2d 415, 418 (1st Cir. 1951)). The district court was required to inquire into the "totality of the circumstances" surrounding the prior use of the mark "to determine whether such an association or notice [was] present." <u>Id.</u> (internal quotation marks omitted). We have determined that a company proved prior use of a mark sufficient to establish ownership when, among other things, "the distribution" of the mark was "widespread" because the mark was accessible to anyone with access to the Internet, <u>id.</u> at 1196; the evidence established that "members of the targeted public actually associated the mark . . . with the [product] to which it was affixed," <u>id.</u>; "the mark served to identify the source of the [product]," <u>id.</u> at 1197; and "other

16

potential users of the mark had notice that the mark was in use in connection with [the product]," id.

As the Federal Circuit has explained, trademark law permits a corporate entity to own the right to the name of a musical group, and the public need not associate the mark with the name of the corporate entity:

> [The corporate entity] submitted a license evidencing its right to control the quality of the sound recordings [of the band]. Since [the corporate entity] controls the quality of the goods, it is the source of the goods. Any trademark for the sound recordings can therefore only indicate source in [the corporate entity] since no other entity is the source. The source of the goods does not depend on the public's perception; the public need not know [the] role [of the corporate entity].

In re Polar Music Int'l AB, 714 F.2d 1567, 1571 (Fed. Cir. 1983) (footnote omitted). We consider whether Crystal (or, more precisely, its predecessor Pantera) satisfied the requirement of "'use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind,'" Planetary Motion, 261 F.3d at 1195 (quoting Mendes, 190 F.2d at 418), ever mindful that the public need not have known the role of the corporate entity, Polar Music, 714 F.2d at 1571.

The district court determined that Crystal failed to prove that it had enforceable rights in the Exposé mark, and that finding is not clearly erroneous. Crystal failed to present evidence sufficient to establish that Pantera appropriated

17

the Exposé mark "'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind'" before Jurado, Curless, and Bruno joined the band. Planetary Motion, 261 F.3d at 1195 (quoting Mendes, 190 F.2d at 418). Crystal presented only the testimony of Garcia to prove that Pantera and the original members of Exposé produced a song that was played on radio stations and in dance clubs in Miami, New York, and Los Angeles, and that the original members made several live performances. Oral testimony, even of a single witness, if "sufficiently probative," may suffice to prove priority, but such testimony "should not be characterized by contradictions, inconsistencies, and indefiniteness"; instead, it "should carry with it conviction of its accuracy and applicability." B.R. Baker Co. v. Lebow Bros., 150 F.2d 580, 583 (C.C.P.A. 1945); see also 2 McCarthy, supra, § 16:20, p. 16-50.3. "[S]uch testimony is obviously strengthened by corroborative documentary evidence," B.R. Baker Co., 150 F.2d at 583, and, absent corroboration, it "should be most carefully scrutinized," id. at 584. The district court heard Garcia's testimony and gave it "less weight than that of the other witnesses" based on inconsistencies "concerning several key issues." In the light of this credibility determination by the district court, to which we accord substantial deference, Copeland, 20 F.3d at 413, Garcia's testimony failed to satisfy the burden of Crystal to prove that it had

18

appropriated the Exposé mark "'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind'" before Jurado, Curless, and Bruno joined the band, Planetary Motion, 261 F.3d at 1195 (quoting Mendes, 190 F.2d at 418).

Because Crystal failed to prove that it first appropriated the Exposé mark, the district court was required to determine the owner of the mark "where prior ownership by one of several claimants cannot be established." Bell, 640 F. Supp. at 580. The Bell court aptly described this controversy as a "case of joint endeavors." Id. We have yet to address a trademark dispute of this type, but other courts have consistently resolved such disputes by awarding trademark rights to the claimant who controls the nature and quality of the services performed under the mark. See Robi v. Reed, 173 F.3d 736, 740 (9th Cir. 1999); Polar Music, 714 F.2d at 1571; Ligotti v. Garafolo, 562 F. Supp. 2d 204, 227 (D.N.H. 2008); Bell, 640 F. Supp. at 580; Rick v. Buchansky, 609 F. Supp. 1522, 1537–38 (S.D.N.Y. 1985).

The Bell court applied a two-step approach in this circumstance: "[T]o determine ownership in a case of this kind, a court must first identify that quality or characteristic for which the group is known by the public. It then may proceed to the second step of the ownership inquiry, namely, who controls that quality or

19

characteristic." Bell, 640 F. Supp. at 581 (footnotes omitted). See also Ligotti, 562 F. Supp. 2d at 217–27; 2 McCarthy, supra, § 16:45, pp. 16-85 to -86 ("Whether the service mark or name [of a performing group] identifies and distinguishes that particular performer combination or just style and quality [is] an issue of fact. . . . The issue to be resolved is whether the mark signifies personalities, or style and quality regardless of personalities."). In Bell, the members of the band "New Edition" and the companies that had produced, recorded, and marketed their first album disputed the rights to the name of the band. The Bell court ruled that the band members owned the mark because they had first appropriated it, and alternatively they owned the mark under the "joint endeavors" test. 640 F. Supp. at 580–82. The court explained that "the quality which the mark New Edition identified was first and foremost the [band members] with their distinctive personalities and style as performers." Id. at 582.

The district court reasonably applied the "joint endeavors" test to determine that Jurado, Curless, and Bruno owned the Exposé mark at common law. The district court found that Crystal failed to prove that it had selected Moneymaker, had exercised control over Jurado, Curless, and Bruno, or had "taken any active role in scheduling any of the group's performances"; Garcia had conceded that he had been unable to put a different group together to perform as Exposé since 1986;

20

the involvement of Crystal with Exposé was limited to collecting royalties from the sale of records; and the private agreements upon which Crystal relied disclosed nothing to the public to change this perception. The district court also found that Exposé had been consistently portrayed to the public as Jurado, Curless, and Bruno since 1986; they were the product denoted by the Exposé mark; they owned the goodwill associated with the mark; and a member of the public who purchased a ticket to an Exposé concert would clearly expect to see Jurado, Curless, and Bruno perform. The record supports these findings that Jurado, Curless, and Bruno controlled the qualities and characteristics that the public associates with the Exposé mark.

### 2. Because Crystal Has No Enforceable Rights in the Exposé Mark, We Need Not Reach the Issue of Consumer Confusion.

"[T]he touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." Custom, 508 F.3d at 647. The district court determined that "the public's interest is best served by exclusively awarding" the Exposé mark to Jurado, Curless, Bruno, and Walking Distance because "[t]o do otherwise would . . . cause unnecessary consumer confusion." Crystal argues that the status of Jurado, Curless, and Bruno as "holdover licensees" establishes the requisite likelihood of consumer confusion under section

21

43(a) of the Lanham Act. See Burger King Corp. v. Mason, 710 F.2d 1480, 1493 (11th Cir. 1983) ("[M]any courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement."). We need not reach this issue because Crystal lacks enforceable rights in the Exposé mark. See Custom, 508 F.3d at 648 n.8.

B. *The Remaining Grounds for Relief Asserted by Crystal Are Without Merit.*

The remaining grounds for relief asserted by Crystal are without merit and warrant little discussion. First, the claim of Crystal under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., fails because the legal standards we apply to that claim are the same as those we have applied under section 43(a) of the Lanham Act, see Custom, 508 F.3d at 652–53. Crystal also seeks relief under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), which "provides a cause of action for a trademark owner against a person who 'has a bad faith intent to profit from [the owner's] mark' and who 'registers, traffics in, or uses a domain name' that is identical or confusingly similar to the owner's distinctive mark or that is identical, confusingly similar to or dilutive of the owner's famous mark," S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d 1235, 1243 (11th Cir. 2009) (footnote omitted) (quoting 15 U.S.C. §

1125(d)(1)(A)(i)–(ii)).  The district court determined that Crystal had failed to prove that it owns the Exposé mark, and Crystal has provided us with no reason to disturb that finding.  Crystal finally argues that the district court violated its right to procedural due process when it awarded exclusive use of the Exposé mark to Jurado, Curless, Bruno, and Walking Distance even though they had not requested a declaration that they owned the mark, but we disagree.  Trademark law ordinarily does not permit two entities to share a mark due to the consumer confusion that would ensue, see 2 McCarthy, supra, § 16:40, pp. 16-76.1 to -77, and the complaint filed by Crystal invited the district court to determine ownership of the mark as between these parties.

## IV.  CONCLUSION

We **AFFIRM** the judgment in favor of Jurado, Weiss, Bruno, and Walking Distance.