[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15197

_____

D.C. Docket No. 8:12-cv-02928-RAL-EAJ

ORLINE SIDMAN,
FLORIDA POLICYHOLDERS, LLC,

                                                            Plaintiffs-Appellants,

versus

TRAVELERS CASUALTY AND SURETY,

                                                            Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 17, 2016)

Before JILL PRYOR, Circuit Judge, and SCHLESINGER,[*] District Judge.[**]

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

JILL PRYOR, Circuit Judge:

The issue before us is whether Travelers Casualty and Surety is bound by a settlement agreement between its insured, Culbreath Isles Property Owners Association, and Phyllis Kirkwood, settling Kirkwood's claim for attorney's fees against Culbreath but stipulating that Kirkwood would not enforce the resulting consent judgment against Culbreath.  Under Florida law, such agreements are unenforceable against insurers if tainted by fraud or collusion.  To determine whether fraud or collusion exists, we look to whether the settlement amount was unreasonable and whether the negotiations were conducted in bad faith.  Substantial evidence exists to support the district court's determination, after a bench trial, that the negotiations were conducted in bad faith when Culbreath agreed to stipulate to a judgment in an amount of Kirkwood's choosing so long as Kirkwood agreed never to execute against it.  We thus affirm the district court's judgment that the settlement agreement cannot be enforced against Travelers.

## I.    BACKGROUND

### A.    Factual Background

This case arises out of Culbreath's attempts to enforce its restrictive covenants against Kirkwood, a homeowner in the Culbreath Isles neighborhood. Culbreath sued Kirkwood in Florida state court for breach of the community's

---

[**] The Honorable Robin S. Rosenbaum, Circuit Judge, heard oral argument and thereafter recused. We therefore decide this case as a quorum.  28 U.S.C. § 46(d).

2

restrictive covenants, alleging that she had failed to maintain her lawn and landscaping.  In her answer, Kirkwood brought a counterclaim for slander of title and also demanded her attorney's fees and costs, as permitted under Florida Statute § 720.305(1),[1] if she prevailed in the lawsuit.

Culbreath notified Travelers, its insurer, of Kirkwood's counterclaim. Travelers provided counsel to defend the counterclaim under a reservation of rights.  Because Travelers' coverage counsel represented Culbreath only with respect to the slander of title claim, a separate attorney paid and retained by Culbreath continued to represent the association on its claim against Kirkwood for violating the restrictive covenants.

The state court granted summary judgment to Kirkwood.  Kirkwood then filed a motion seeking her attorney's fees and costs under § 720.305.  Culbreath notified Travelers that Culbreath was potentially liable to Kirkwood for her fees and requested coverage under the policy.  Travelers denied Culbreath's request to defend and disclaimed coverage with respect to Kirkwood's attorney's fees claim.

Culbreath and Kirkwood began to litigate the attorney's fees issue.  Initially, Mark Buell, Kirkwood's attorney, advised Culbreath that his attorney's fees were $87,175, and that he would seek a multiplier of two to two-and-a-half on any fee

---

[1] This statute authorizes, among other things, homeowners associations to bring actions against their members for violating the community's governing documents or the association's rules.  *See* Fla. Stat. § 720.305(1).  Importantly, it entitles "[t]he prevailing party in any such litigation" to "reasonable attorney fees and costs."  *Id.*

awarded. Culbreath contested this amount, retaining an expert who opined that the requested fee was unreasonable and unnecessary. Based on the expert's opinions, Culbreath's attorney was prepared to litigate the issue in court.

At the same time, Culbreath and Kirkwood explored the prospect of settling the attorney's fees claim. Culbreath kept Travelers informed of the ongoing settlement negotiations and sought to convince Travelers to provide coverage. When Culbreath and Kirkwood were close to an agreement, Culbreath informed Travelers' attorney that it was prepared to agree to a $295,000 judgment on Kirkwood's attorney's fee claim. Travelers' attorney neither objected nor advised Culbreath against agreeing to the judgment. Travelers has acknowledged that it knew prior to the settlement agreement's execution of Culbreath and Kirkwood's settlement discussions and the specific terms discussed.

Kirkwood and Culbreath entered into a Joint Stipulation and Agreement (the "settlement agreement") in which Culbreath agreed to (1) entry of a $295,000 consent judgment against it for "trial court and appellate fees and costs," payable to Buell & Elligett, P.A. ("Buell"), the law firm representing Kirkwood and (2) assignment to Kirkwood and/or Buell of the proceeds from any and all actions, causes of actions, or rights Culbreath had against Travelers, in exchange for Kirkwood's agreement not to execute the judgment against Culbreath. Joint

4

Stipulation and Agreement at 3 (Doc. 67-14).[2]  Buell signed the settlement agreement on Kirkwood's behalf.  At the time, Kirkwood was incapacitated due to a stroke.  Soon thereafter, Orline Sidman was appointed her guardian.  The state court approved the settlement agreement and entered the Consent Final Judgment without a hearing.

Kirkwood and Culbreath also executed a promissory note that they did not disclose to the state court in which Culbreath agreed to pay Kirkwood or Buell $50,000 less whatever amount Kirkwood or Buell could obtain from Travelers; if they succeeded in obtaining $50,000 or more, Culbreath would owe them nothing. Buell again signed on Kirkwood's behalf.  After the state court entered judgment, Culbreath assigned its rights against Travelers under its insurance policy to Kirkwood and/or Buell.

## B.    Procedural History

Sidman, on behalf of Kirkwood, brought a third-party breach of contract suit in state court against Travelers.[3]  Sidman alleged that Travelers breached the contract of insurance with Culbreath when Travelers refused to defend and indemnify Culbreath with respect to Kirkwood's claim for attorney's fees and that

---

[2] Unless otherwise specified, all citations in the form "Doc. __" refer to the district court docket entries.

[3] Culbreath initially was a plaintiff in this case because it brought claims against Travelers with respect to attorney's fees awarded to a different homeowner.  Culbreath and Travelers settled that dispute, which is not before us.

5

Culbreath had assigned its right to proceed against Travelers to Kirkwood. Travelers removed the action to federal court.

Travelers moved to dismiss the action for failure to join an indispensable party, asserting that Buell should have been joined because Culbreath had assigned its right to sue Travelers to Kirkwood as well as Buell. Buell then assigned its rights against Travelers to Florida Policyholders, LLC ("FP"), an entity created by the Buell partners. Sidman and FP filed an amended complaint joining FP as a plaintiff.

After discovery, the district court granted summary judgment to Travelers on the ground that the insurance policy did not cover Kirkwood's claim for attorney's fees and costs. On appeal, we concluded that Travelers owed a duty to defend and indemnify Culbreath with respect to Kirkwood's claims and thus reversed and remanded for further proceedings. *Culbreath Isles Prop. Owners Ass'n, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 601 F. App'x 876, 879 (11th Cir. 2015).

Upon remand, the district court held a bench trial to determine whether the settlement agreement bound Travelers. Travelers presented evidence that, it contended, showed the amount of Kirkwood's attorney's fees was unreasonable and that Kirkwood and Culbreath colluded when they entered into the settlement agreement.

6

With respect to collusion, Travelers presented evidence about Culbreath's attempt to settle a similar attorney's fees claim.[4] Around the same time that it sued Kirkwood, Culbreath also sued Richard and Nancy Lewis, also homeowners in Culbreath Isles, for violating the restrictive covenants. Like Kirkwood, the Lewises defeated Culbreath's claim at summary judgment and then sought their attorney's fees from Culbreath. Scott Frick, the Lewises' attorney, testified that during settlement negotiations Culbreath offered to assent to any attorney's fee amount the Lewises sought, so long as they agreed not to execute the judgment against Culbreath. Frick testified that Culbreath acknowledged it reached a similar agreement with Kirkwood.

The district court found that the settlement agreement was neither reasonable in amount nor negotiated in good faith and thus could not be enforced against Travelers. Specifically, the court determined that Culbreath "acted in bad faith when it offered to 'lie down' and accept a judgment of $295,000 against it as long as recovery of that sum came from Travelers." *Culbreath Isles Prop. Owners Ass'n, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 151 F. Supp. 3d 1282, 1292 (M.D. Fla. 2015). To support this determination, the district court found that Culbreath had allowed Kirkwood to determine the amount of the consent judgment in

---

[4] Because we conclude substantial evidence supported the district court's determination that the settlement agreement was negotiated in bad faith, we need not discuss the evidence relating to the reasonableness of the attorney's fee.

7

exchange for an agreement to collect it only from Travelers and not Culbreath. The court then entered judgment in favor of Travelers and against Sidman and FP. This is Sidman and FP's appeal.

## II.    STANDARD OF REVIEW

After a bench trial, "[w]e review the [district] court's conclusions of law *de novo*." *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 592 (11th Cir. 2007).  "The district court's findings of fact—including determinations of the credibility of witnesses and weight of the evidence—will not be set aside unless they are clearly erroneous."  *Id.*  "Under the clear error standard, we may reverse the district court's findings of fact if, after viewing all the evidence, we are left with the definite and firm conviction that a mistake has been committed."  *Crystal Entm't & Filmworks, Inc. v. Jurado*, 643 F.3d 1313, 1319-20 (11th Cir. 2011) (internal quotation marks omitted).  But the district court's findings of facts must "stand so long as they are supported by substantial evidence."  *Fischer*, 508 F.3d at 592.

"In a case in which the evidence is largely testimonial, like this one, the district court has the advantage of observing the witnesses and evaluating their credibility firsthand, and the standard of review imposes an especially heavy burden on an appellant."  *Id.* (internal quotation marks omitted).  Stated another way, "[t]he credibility of a witness is in the province of the factfinder and this

8

court will not ordinarily review the factfinder's determination of credibility."

*Crystal Entm't*, 643 F.3d at 1320.

## III.    ENFORCEABILITY OF THE SETTLEMENT AGREEMENT

To determine whether the district court erred in refusing to enforce the settlement agreement, we must first decide whether the district court (1) used the correct legal framework to determine whether the settlement agreement was enforceable against Travelers and (2) had substantial evidence to support its factual findings that the agreement's amount was unreasonable and that Culbreath and Kirkwood did not negotiate in good faith.

## A.    The District Court Applied the Correct Legal Framework to Determine Whether the Settlement Agreement Was Enforceable Against Travelers.

The first issue we consider is whether and when, under Florida law, an insurer who wrongly refuses to defend its insured is bound by a settlement agreement that the insured negotiates permitting the injured party to collect the judgment only from the insurer.

### 1.    *Florida Courts Construe* Coblentz *as Preventing Enforcement Against an Insurer of a Settlement Agreement That Is Unreasonable in Amount or Produced through Bad Faith.*

Sidman and FP rely on *Coblentz v. American Surety Co.*, 416 F.2d 1059 (5th Cir. 1969), to argue that Travelers is so bound.  In *Coblentz*, our predecessor court recognized that under Florida law, an insurer who wrongly refused to defend its insured is bound by the insured's settlement agreement unless the agreement was

9

obtained through "fraud or collusion," even though the insurer did not appear in the underlying action. *Id.* at 1062-63.[5]  Because there was no allegation that the settlement in *Coblentz* was obtained by fraud or collusion, the court did not address how to determine when fraud or collusion exists.

Florida courts have recognized the difficulty inherent in determining whether a *Coblentz* agreement was obtained by fraud or collusion.  To illustrate this difficulty, in *Steil v. Florida Physicians' Insurance Reciprocal*, the Florida court contrasted a settlement agreement that permits collection only against the insurer with a settlement agreement where the insured could be on the hook for the judgment.  448 So.2d 589 (Fla. Dist. Ct. App. 1984).[6]  When the insured "actually pays for the settlement of the claim against him or where the case is fully litigated at trial before the entry of a judgment, the amount of the settlement or judgment can be assumed to be realistic." *Id.* at 592.  When negotiating directly its own liability, an insurer can protect its own interests; similarly, an independent factfinder is unlikely to approve an unreasonable settlement amount.  "Therefore, if the insurer is later determined to have wrongfully refused to defend and the claim

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[6] Because the Florida Supreme Court has not addressed how to determine when a settlement was obtained by fraud or collusion, in this diversity case governed by Florida law "we follow relevant decisions of Florida's intermediate courts and attempt to determine the issues of state law as we believe the Florida Supreme Court would." *Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1177 (11th Cir. 2013) (internal quotation marks omitted).

is within the coverage, it will be obligated to pay the amount of the settlement or judgment, at least within its policy limits, in the absence of a showing of collusion or fraud." *Id.*

But the settlement amount in a *Coblentz* agreement that "involve[es] a consent judgment with a covenant not to execute" may not necessarily represent a realistic valuation of the injured party's claim. *Id.* When an insured "stipulates to a large settlement figure in order to obtain his release from liability," it "has little or nothing to lose because [it] will never be obligated to pay. As a consequence, the settlement of liability and damages may have very little relationship to the strength of the plaintiff's claim." *Id.* Although such conduct by itself "can hardly be characterized as fraudulent," the emergent "settlement figure is more suspect" than one produced through a more adversarial process. *Id.*

The Florida court then addressed how to evaluate whether a *Coblentz* agreement is tainted by fraud or collusion. In crafting a standard, the court weighed the countervailing interests of (1) protecting insurers against settlement agreements that overstate their liability and (2) preserving incentives for insureds and injured parties to resolve claims when they can. The *Steil* court recognized the need to protect insurers when the injured party and the insured settle for an amount for which neither will be on the hook: the settlement "may not actually represent

11

an arm's length determination of the worth of the plaintiff's claim."[7]  *Id.*  At the same time, *Steil* recognized that countervailing policy interests weigh in favor of enforcing *Coblentz* agreements against insurers.  If an insured's mere lack of incentive to negotiate would render a *Coblentz* agreement fraudulent or collusive, such agreements could rarely be enforced.  As a result, insureds and injured parties would be discouraged from settling their claims even when they were able to reach agreement on the amount of the insured's liability.  Instead, injured parties would have an incentive to insist either that an independent factfinder determine the amount of liability or that insureds pay out of their own pockets.  *See id.*

Given these competing interests, the *Steil* court explained that *Coblentz* agreements could not be reviewed under "the ordinary standard of collusion or fraud," under which they would often if not always be invalid.  *Id.*  Instead, it directed courts to look to evidence of an unreasonable settlement amount and of bad faith on the part of the negotiating parties as proxies for collusion or fraud.  *Id.*  *Steil* also assigned the party seeking to enforce a *Coblentz* agreement the initial burden of producing "evidence sufficient to make a prima facie showing of reasonableness and lack of bad faith, even though the ultimate burden of proof will rest upon the carrier."  *Steil*, 448 So.2d at 592.

---

[7] *See also Bond Safeguard Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, No. 13-cv-561, 2014 WL 5325728, at *9 (M.D. Fla. Oct. 20, 2014) ("*Coblentz* does not . . . authorize the insured to indiscriminately load the carrier's wagon with bricks of damage that no reasonable person would expect as consequences of the underlying claim.").

Because the Florida Supreme Court has not addressed how to determine when a settlement agreement is tainted by fraud or collusion, and in light of our obligation to resolve questions of Florida law as we believe it would, we conclude that *Steil* provides the proper framework for analyzing whether a *Coblentz* agreement is enforceable under Florida law.  Indeed, other Florida District Courts of Appeal have adopted *Steil*'s analytical framework.  *See, e.g.*, *Hyatt Legal Servs. v. Ruppitz*, 620 So. 2d 1134, 1136 (Fla. Dist. Ct. App. 1993) ("To protect against the obvious possible abuses of th[e *Coblentz*] settlement procedure, we held that the insured must prove that the settlement was reasonable and was not tainted by bad faith."); *Quintana v. Barad*, 528 So. 2d 1300, 1301 n.1 (Fla. Dist. Ct. App. 1988) ("Subsequent to entry of the [*Coblentz*] agreement, the injured party must bring an action against the insurer and prove coverage, wrongful refusal to defend, and that the settlement was reasonable and made in good faith.").  Thus, we conclude the district court used the proper framework to determine whether fraud or collusion tainted the settlement when it considered the reasonableness of the settlement amount and whether it was negotiated in good faith.

> 2.    *Under Florida Law, an Insurer is Not Bound by a Fraudulent or Collusive* Coblentz *Agreement Merely Because It Knew of and Failed to Object to the Settlement Earlier.*

Sidman and FP argue that the *Coblentz* framework is inapplicable here because Travelers knew about and acquiesced in the settlement.  We reject this

13

assertion as legally unsupported.  The practical effect of such a rule would be that once an insurer is given prior notice of and fails to object to a settlement agreement between its insured and an injured party, it will be deemed to have waived all objections despite underlying fraud or collusion of which it had no knowledge. There is no such rule in Florida law.[8]

Sidman and FP cite *Jones v. Florida Insurance Guaranty Association* for the proposition that a judgment against an indemnitee is enforceable against an indemnitor under Florida law so long as the indemnitor had notice of the settlement and could have, but declined to, object.  908 So.2d 435, 450 (Fla. 2005).  They also rely on cases addressing Florida's "vouching in" doctrine, which recognizes "[t]he general rule" that "an indemnitor who has notice of the suit filed against the indemnitee by the injured party and who is afforded the opportunity to appear and defend is bound by a judgment rendered against the indemnitee as to all material questions determined by the judgment." *Camp, Dresser & McKee, Inc. v. Paul N. Howard Co.*, 853 So.2d 1072, 1079 (Fla. Dist. Ct. App. 2003).

But like *Coblentz*, *Jones* and the vouching in cases explicitly recognize that an agreement between an indemnitee and injured party is enforceable against an absentee indemnitor only if rendered "without fraud or collusion." *Jones*, 908

---

[8] Indeed, such a rule would seem to conflict with a recent statement of the Florida Supreme Court that an insured's "*reasonable* settlement agreement" may be enforced against an insurer who wrongfully refuses to defend.  *Perera v. U.S. Fid. & Guar. Co.*, 35 So.3d 893, 900 (Fla. 2010) (emphasis added).

14

So.2d at 450 (internal quotation marks omitted); *Camp, Dresser & McKee, Inc.*, 853 So.2d at 1079 (same).[9]  Here, because Travelers contends that the settlement agreement was in fact rendered through fraud or collusion, even under Sidman and FP's authorities, it is not enforceable.

Despite the exception for fraud and collusion, Sidman and FP argue that under the vouching in cases, in entering a consent judgment the state court implicitly decided that the settlement amount was reasonable in amount and negotiated in good faith such that the indemnitor is bound by the determination. We disagree.  The vouching in doctrine concerns only issues that were actually determined by the settlement judgment, *see Camp, Dresser & McKee*, 853 So.2d at 1079, and here, the question of whether fraud or collusion tainted Kirkwood and Culbreath's settlement agreement was not litigated in the action in which it was entered; the state court simply entered the consent judgment.  Furthermore, we cannot say that an indemnitor's knowledge of a *Coblentz* agreement's terms will necessarily put it on notice that the agreement arises from fraud or collusion, as the agreement's fraudulent or collusive nature will not always (or even often) be apparent on its face.  This case is illustrative: neither the settlement agreement nor the consent judgment reflected the insured's offer to accept a judgment of any

---

[9] Sidman and FP also cite *Burke v. Ripp*, 619 F.2d 354 (5th Cir. 1980), but *Burke* did not address what standard courts should apply to determine whether an agreement is fraudulent or collusive; in that case there was no allegation that the agreement was fraudulent or collusive.

amount so long as the injured party refrained from seeking satisfaction against it.[10]

This conduct was fraudulent and collusive, yet nothing on the settlement

agreement's face would reveal that fact.

We acknowledge that allowing insurers to challenge settlement agreements

between their insureds and injured parties after having kept quiet during the

settlement negotiations may appear inequitable or at the very least inefficient.

Indeed, Sidman and FP portray Travelers as lulling Kirkwood and Culbreath into

complacency by failing to object in the state court case to the settlement agreement

or consent judgment.  But even under the legal framework that Sidman and FP

advance, Travelers would not be bound by a settlement agreement that was

obtained by fraud or collusion.  And we follow the Florida courts in rejecting a

framework that would, in effect, prohibit indemnitors and insurers from

challenging settlement agreements as fraudulent or collusive simply because they

had knowledge of the settlement terms, even though the fraudulent or collusive

---

[10] Sidman and FP raise a related argument that Travelers' failure to object to the settlement terms during negotiations equitably estops it from raising its current challenge. Estoppel "prevents a party from raising a claim or taking a legal position when his conduct with regard to that claim is contrary to his position. [It] requires (1) words, acts, conduct, or acquiescence causing another to believe in the existence of a certain state of things; (2) willfulness or negligence with regard to the acts, conduct, or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Matter of Garfinkle*, 672 F.2d 1340, 1346-47 (11th Cir. 1982). "Silence or acquiescence may be sufficient conduct to create an estoppel if under the circumstances there was both a duty and opportunity to speak." *Id.* at 1347. Here there was neither a duty nor an opportunity to speak because Travelers had no knowledge of the fraudulent and collusive nature of the settlement agreement, and it never claimed or took the position that the settlement agreement was untainted by fraud or collusion.

16

nature of the agreement was not apparent from the face of the settlement or even was hidden from the insurer by the parties to the settlement. Had Kirkwood and Culbreath negotiated a reasonable settlement agreement in good faith, they would have been entitled to bind Travelers to it under *Coblentz*. By choosing instead to collude, they forfeited this right.

In summary, the relevant inquiry for determining whether to enforce a *Coblentz* agreement against an insurer that wrongfully denied coverage and refused to defend is whether the agreement was produced through fraud or collusion, not whether the insurer had notice of the settlement and an opportunity to object to it. A contrary approach would render *Coblentz*'s fraud or collusion exception meaningless, as all *Coblentz* agreements arise out of an insurer's refusal to defend its insured. Thus, an insurer may challenge a *Coblentz* agreement as fraudulent or collusive notwithstanding its prior notice of and opportunity to challenge the agreement. The district court properly applied the *Coblentz* framework in considering whether the settlement was unreasonable in amount and negotiated in bad faith—proxies for fraud or collusion—and did not err in allowing Travelers to challenge the settlement agreement.

**B.    The District Court Did Not Err in Determining that the Settlement Agreement Was Negotiated in Bad Faith.**

We next consider whether the district court erred in determining that the settlement agreement was unreasonable in amount and negotiated in bad faith.

17

Because substantial evidence supports the district court's finding that Culbreath agreed to settle the claim for any amount in exchange for Kirkwood and Buell's agreement not to execute the judgment against it, we affirm on the ground that the settlement agreement was negotiated in bad faith, without the need to consider whether the settlement was reasonable in amount.

Substantial evidence supports the district court's determination that the parties negotiated the consent judgment in bad faith. To find bad faith, the district court relied on evidence that Culbreath was willing to agree to any fee so long as the Kirwood and Buell would enforce the judgment only against Travelers.[11] Frick, the attorney for the Lewises—the other homeowners Culbreath sued— testified that Culbreath offered to "stipulate to whatever number that you want" with respect to the Lewises' attorney's fee claim, so long as they would agree not to execute against Culbreath.[12] Trial Tr. at 102 (Doc. 170). He also testified that Culbreath acknowledged having entered into a similar arrangement with Kirkwood, agreeing to a large multiplier in exchange for Kirkwood's agreement to collect the judgment from Travelers. In addition, Kirkwood, Buell, and Culbreath

_____

[11] The district court also relied on the fact that Mark Buell signed the settlement agreement on behalf of Kirkwood, who was hospitalized at the time following a stroke that left her incapacitated and unable to give her consent. Because we find substantial evidence to support the district court's determination that the settlement negotiations were conducted in bad faith without considering the circumstances under which the agreement was signed, we have no need to review the district court's findings on this issue.

[12] Frick testified that Culbreath said, "Hey, if you don't come after us for the fees, we don't care how much it is." Trial Tr. at 105 (Doc. 170).

18

had entered into a side agreement—which they did not disclose to the state court—in which Culbreath agreed to pay Kirkwood or Buell up to $50,000 depending on their relative success in enforcing the settlement agreement against Travelers.

This evidence supports the inference that the settlement agreement was negotiated in bad faith, as it shows that Culbreath was willing to lie down and accept a judgment of any amount against it so long as it would not be on the hook to satisfy the judgment. It demonstrates that Culbreath only acquiesced to this arrangement because it believed that it could impose on Travelers all or most of the financial burden of the settlement agreement, with its own exposure limited to $50,000 pursuant to the side agreement. A reasonable party would not be indifferent to the amount of a judgment entered against it were its own money on the line. As factfinder, the district court was entitled to accept Frick's testimony as credible. *Crystal Entm't*, 643 F.3d at 1320. The district court's finding that the settlement agreement was negotiated in bad faith was thus not clearly erroneous.

Sidman and FP argue that the settlement agreement was not collusive as a matter of Florida law because Kirkwood and Culbreath never agreed to share the settlement proceeds. They contend that *Chomat v. Northern Insurance Company of New York*, held that an agreement is collusive only if the parties to the agreement agreed to split its proceeds. 919 So. 2d 535, 538 (Fla. Dist. Ct. App. 2006). But they misread the authority on which they rely. In *Chomat*, the Florida

District Court of Appeal stated, "[w]ithout attempting a comprehensive definition, we think a bad faith claim includes a false claim, or collusion in which the plaintiffs agree to share the recovery with the insured." *Id.* (internal citation omitted). Although *Chomat* recognized that an agreement to split a negotiated judgment is one form of collusion, it did not hold that collusion *requires* an agreement between injured party and insured to split a negotiated judgment.

Indeed, such a construction is inconsistent with the term collusion's ordinary meaning. Dictionary definitions of collusion include a "secret agreement," "secret cooperation for a fraudulent or deceitful purpose," "a secret agreement between two or more persons to defraud a person of his rights often by the forms of law," an "agreement between parties considered adversaries at the law," and "a secret agreement considered illegal for any reason." *Collusion*, Webster's 3d New Int'l Dictionary 446 (2002). These definitions do not require an agreement to split a scheme's bounty, and they easily encompass Kirkwood and Culbreath's agreement. Accordingly, we hold that an agreement in which an insured agrees to accept essentially any judgment amount that the injured party seeks in exchange for a promise to not execute against it is collusive for *Coblentz* purposes. We therefore affirm the district court's finding of bad faith.[13]

---

[13] In their reply brief, Sidman and FP raise for the first time the argument that the district court erred in declining to award them a "reasonable" attorney's fee of its own calculation after finding that they could not enforce the settlement agreement against Travelers. "Parties must

20

## V.    CONCLUSION

For the foregoing reasons, we conclude that the district court properly applied the *Coblentz* framework to determine whether the settlement agreement could be enforced against Travelers, that its finding of bad faith in the settlement agreement's negotiation rested on substantial evidence, and that it did not err in declining to award Sidman and FP a reasonable attorney's fee.  Accordingly, we affirm its judgment.

**AFFIRMED.**

---

submit all issues on appeal in their initial briefs." *United States v. Britt*, 437 F.3d 1103, 1104 (11th Cir. 2006).  Because Sidman and FP failed to raise this argument in their initial brief, we will not entertain it now.